J-S05003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: L.K.A. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.M.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1102 WDA 2023 |

Appeal from the Decree Entered August 22, 2023
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
17 in Adoption 2023

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: R.A.S.   APPEAL OF N.M.O., MOTHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1103 WDA 2023 |

Appeal from the Decree Entered August 22, 2023
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
No. 25 in Adoption 2023

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: G.E.S. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.M.O., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1104 WDA 2023 |

Appeal from the Decree Entered August 22, 2023
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
No. 25a in Adoption 2023

BEFORE:  PANELLA, P.J.E., KING, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:                    **FILED: MARCH 4, 2024**

In these consolidated appeals,[1] N.M.O. ("Mother") appeals from the decree entered in the Court of Common Pleas of Erie County which granted the petition of Erie County Children and Youth Services ("CYS") and involuntarily terminated her parental rights to her minor children, L.K.A. (d.o.b. 2/2020), G.E.S. (d.o.b. 5/2014), and R.A.S. (d.o.b 4/2013) (collectively "Children"), pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) of the Adoption Act, 23 Pa.C.S.A. §§ 2511-2514.[2] We affirm.

Mother is the biological mother of the Children. The orphans' court adjudicated the Children dependent on November 9, 2021, with the full consent of the parties.[3] At the disposition hearing held immediately thereafter, Mother agreed to the following treatment plan:

> 1. Contact the [CYS] to sign releases and schedule home visits with the [CYS] caseworker;
>
> 2. Refrain from the use of drugs and/or alcohol and submit to a color code urinalysis testing … ;

---

[1] The Court consolidated the cases *sua sponte* on November 3, 2023.

[2] The decree also involuntary terminated the rights of the Children's biological fathers, A.A. and R.S. They have not appealed.

[3] Mother was represented by counsel at all but the December 7, 2022 permanency review hearing. Attorney Steven George acted as the guardian *ad litem* ("GAL") for the Children at all hearings prior to the hearing on CYS's Petition for Involuntary Termination of Parental Rights ("IVT"). At the IVT hearing, Attorney George represented R.A.S. and G.E.S., and Attorney Catherine Allgeier represented L.K.A.

3. Participate in a Drug and Alcohol Assessment and follow through with recommendations and demonstrate skills learned;

4. Participate in a Mental Health Assessment and follow through with recommendations and demonstrate skills learned;

5. Participate in a domestic violence and anger management program and demonstrate skills learned;

6. Obtain and maintain safe and stable housing and provide for basic needs of the [Children];

7. Obtain/maintain employment and provide proof to the [A]gency;

8. Participate in an approved parenting program and demonstrate skills learned;

9. Ensure that the [C]hildren's medical, dental and mental health needs are met, and;

10. Ensure that the [C]hildren attend school on a regular basis.

Orphans' Court Opinion, 10/10/23, at 2.

After being adjudicated dependent, the Children briefly remained in Mother's care. On January 24, 2022, CYS sought an order for emergency protection for R.A.S. because he was afraid to go home with Mother to the house they were staying in with her paramour. R.A.S. was removed from Mother's home and placed in kinship care with Maternal Grandmother.

The court provided a court summary and addendums that were made part of the record without objection in advance of all review hearings. At the January 26, 2022 hearing, CYS reported that Mother was engaged in mental health treatment, signed all CYS releases, was meeting the Children's medical

and educational needs, and was participating in a parenting program. The court found Mother moderately compliant and ordered her to continue following all treatment plan goals. R.A.S.'s goal remained reunification and G.E.S. and L.K.A. remained in Mother's custody.

On March 9, 2022, CYS filed an emergency protective order for G.E.S. and L.K.A. due to reports that Mother was not meeting their basic needs, Mother's suspected drug use, inappropriate discipline and supervision, concerns about Mother's mental health, and safety concerns related to Mother's paramour. The court granted the emergency protective order, and G.E.S. and L.K.A. were removed from Mother's care and placed with Maternal Grandmother. Their permanency goal was reunification.

At the August 2, 2022 hearing, CYS reiterated the concerns that led to the Children's emergency protective orders and noted that Mother was not complying with several treatment plan goals. In particular, over the course of the review period, Mother tested positive for Fentanyl, Amphetamines, Methamphetamines, and Cocaine, despite claiming that she was not using drugs. The Children's behavior had improved since being in Maternal Grandmother's care. The court found Mother minimally compliant with her treatment plan and that she had made no progress in alleviating the circumstances that led to the Children's placement. The Children's permanency goal was reunification with a concurrent goal of adoption.

At the December 7, 2022 review hearing, the court once again found Mother to be minimally compliant with her treatment plan and that there was no progress in alleviating the conditions that led to the Children's removal. Although Mother had obtained new housing since the last hearing, she was facing eviction. She was not regularly following through with mental health treatment and domestic violence remained a concern. Mother was engaging in some drug and alcohol services, but she had tested positive for Fentanyl eleven times since the last hearing. The court found the Children continued to do well in Maternal Grandmother's care. The permanency goal remained reunification concurrent with adoption and the court scheduled a 60-day review. The court advised Mother that she would need to make significant progress in her treatment plan or the Children's goal would be changed to adoption.

Mother participated with the January 25, 2023 review hearing by telephone because she was in inpatient treatment for her mental health due to attempting suicide. Her counsel was present at the hearing. All parties were on notice that CYS was seeking a goal change to adoption. The court found that Mother had made no progress in her treatment plan and that the circumstances that led to the Children's removal had not been alleviated. Mother continued to test positive for illegal drugs, she remained in an unstable and unsafe home to which the police had been called for domestic violence several times, Mother was delinquent on rent, and the caseworker observed

Mother's home to be dirty and inappropriate for the Children. During the review period, Mother had also been unsuccessfully discharged from her mental health treatment for not following through with services. The court changed the Children's permanency goals to adoption.

CYS filed a petition to involuntarily terminate Mother's parental rights on March 9, 2023. The court held a hearing on the petition on August 21, 2023. CYS caseworker Sandra Tate and CYS permanency caseworker Rachel Campbell testified on behalf of CYS. Mother testified on her own behalf.

Consistent with the foregoing facts, Tate testified that Mother struggled to follow through with her treatment plan throughout the case. Mother did not maintain employment, continued to test positive for controlled substances, did not follow through with her mental health treatment and recommendations, and persisted in unhealthy relationships with paramours. Tate observed the visits between Mother and the Children. She recounted one concerning interaction in which Mother told G.E.S. that it was his fault the Children were removed from her care, because he said he was afraid of her paramour.

Maternal Grandmother is an adoptive resource for the Children. Tate and Campbell testified that Maternal Grandmother is meeting all the Children's needs. Maternal Grandmother takes the Children to 100% of their medical appointments. G.E.S. and R.A.S. have both been diagnosed with ADHD. The Children had a lot of behavioral issues and were on a lot of medication when in Mother's care. G.E.S. does not require any medication now and R.A.S.'s

dose has been significantly decreased because they now get "stable, consistent treatment." N.T. Hearing, 8/21/23, at 12, 25, 42. The truancy issue that the Children had while residing with Mother has completely stopped and the Children are attending school regularly.

Campbell has been attending the visits between Mother and the Children since June 2023. Campbell testified that between then and the termination hearing, the Children and Mother had no interaction other than when the Children smiled and waved at her in the hallway at the July 14, 2023 permanency review hearing. The Children do not ask either Campell or Maternal Grandmother about Mother, which Campbell attributed to the Children being accustomed to seeing Mother only sporadically.

Tate and Campbell both testified that termination of Mother's parental rights is in the best interest of the Children because they are thriving in the consistent, safe, and stable environment provided by Maternal Grandmother's home.

Mother testified that after her release from St. Vincent Health where she was inpatient due to her suicide attempt, she immediately went to a rehabilitation facility for substance abuse. After her successful completion of the substance abuse program, Mother resided at House of Healing for additional rehabilitation services. Mother then moved to a halfway house, but she left halfway through the three-month program because she was "having mental health setbacks." *Id.* at 47. She immediately moved in with her newest

paramour, whom she had been dating for two months, and his mother. Mother had lived with the paramour for three months at the time of the hearing. She explained that she has known him for "like ten years." *Id.* at 59.

Mother testified that she was doing everything required by her treatment plan. Despite having several positive drug tests for Fentanyl, she denied using the drug and testified that, other than her December 2023 relapse, she had not used illegal narcotics. When questioned if she was addressing her mental health, Mother responded that if she were not addressing her mental health, "there would have been a lapse in [her] medication," but that there had not been because she sees her psychiatrist as required. *Id.* at 51.

Mother testified that she did not believe it was necessary for the Children to be removed from her home or that CYS gave her an opportunity to show she was able to parent the Children, despite the fact that the Children remained in Mother's care when they were first declared dependent. Mother testified that they were living in a homeless shelter at that time and she took care of the Children while there, but the Children were removed as soon as she found somewhere to live. Mother said that her trailer was messy the time the CYS caseworker visited because Mother had pneumonia. Mother claimed that she did everything Tate asked of her before the Children's permanency goal was changed to adoption in January 2023.

The court asked for the positions of Attorney George, legal counsel for R.A.S. and G.E.S., and Attorney Allgeier, legal counsel for L.K.A. Attorney George told the court that he believed CYS had met its burden of proof. However, he suggested that the goal of R.A.S. and G.E.S. be changed to permanent legal custodianship instead of terminating Mother's parental rights because R.A.S. and G.E.S. loved Mother but wanted to remain in Maternal Grandmother's care. Attorney Allgeier noted that L.K.A. was only three years old at the time of the hearing and unable to really state a preference. However, based on the evidence presented, Attorney Allgeier believed that CYS had offered clear and convincing evidence to support the termination of Mother's parental rights to L.K.A. Attorney Allgeier noted that L.K.A. had been in placement for 17 months and that L.K.A. needed permanency and stability and had found that with the Maternal Grandparents. Attorney Allgeier stated that it would be in L.K.A.'s best interest if Mother's parental rights were terminated.

The court found CYS provided clear and convincing evidence that Mother's parental rights should be terminated pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8) and that the termination was in the best interest of the Children pursuant to 23 Pa.C.S.A. § 2511(b). Mother timely appealed and filed a contemporaneous statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i).

Mother argues the orphans' court committed an abuse of discretion and an error of law when it concluded that CYS had presented clear and convincing evidence that the termination of Mother's parental rights was in the Children's best interest pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8) and section § 2511(b).

Our scope and standard of review are as follows:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

> Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.
>
> > We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, we examine the orphans' court's finding that CYS provided clear and convincing evidence to support termination pursuant to section 2511(a)(1). *See In re B.L.W.*, 843 A.2d at 384.

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511 of the Adoption Act, which provides, in pertinent part:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> \* \* \*
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(1), (b).

A petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021)** (citation omitted).

To establish grounds for termination pursuant to section 2511(a)(1), "[a] petitioner … must demonstrate by competent, clear and convincing evidence, [that] [t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." ***C.M.*, 255 A.3d at 363-64** (citation, footnote, and internal quotation marks omitted).

> [O]ur courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

***In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021)** (brackets, internal citations and quotation marks omitted). "[F]ortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more

- 12 -

suitable time to perform parental responsibilities." *Id.* at 592 (citation and internal quotation marks omitted).

When considering the applicability of Section 2511(a)(1), the orphans' court should consider the entire history of the case rather than mechanically apply the statutory six-month requirement. *See* *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592. "[E]ven where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months ..., the court must examine the individual circumstances … to determine if that evidence clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citation, brackets, and internal quotation marks omitted). For purposes of the court's Section 2511(a) analysis, the totality of the circumstances includes consideration of "the parent's explanation [and] the post-abandonment contact between the parent and child including [the parent's efforts to maintain contact.]" *Id.* (citation omitted).

Instantly, in concluding that CYS had provided clear and convincing evidence to support the termination of Mother's parental rights, the orphans' court explained:

> Initially, Mother was given an opportunity to work with [CYS] and engage in services while the Children remained in her home. However, Mother demonstrated within a few months of the

adjudication she was unable to safely parent the [C]hildren and meet their basic needs.

The Children came into care in November 2021, due to concerns of Mother's substance use, failure to treat her mental health, unstable housing and unsafe housing due to improper paramours. Throughout the fourteen months before the goal was changed, Mother was unable to alleviate any of those issues; in fact, she failed to even acknowledge they existed. Even at the time of the IVT trial, after completing inpatient treatment for substance abuse, Mother still denied any drug use until December of 2022. Additionally, Mother has never accepted her role in the Children's removal as evidenced by her testimony at the IVT trial that she was never given a chance to show [CYS] she could safely parent the Children.

While it is admirable that Mother has finally taken steps to address her substance use issues, it is concerning she does not appear to be adequately addressing her mental health and left her three-month program … to move in with yet another paramour. It is clear, even after undergoing inpatient treatment for both her mental health and substance use, Mother is still unable to demonstrate an ability to safely parent the Children.

Orphans' Court Opinion, 10/10/23, at 14-15.

The record supports the orphans' court's findings. The Children were adjudicated dependent due to CYS's concerns about Mother's use of drugs and alcohol, her mental health, housing instability and Mother's poor supervision of the Children. *See* N.T. IVT Trial, 8/21/23, at 6. The Children initially remained in Mother's home but had to be removed a few months later. R.A.S. was removed from Mother's home and placed with Maternal Grandmother when he refused to go home with Mother because he did not feel safe where they were living with her paramour. *See id.* at 8. L.K.A. and G.E.S. were

removed and placed in Maternal Grandmother's home due to continuing mental health and drug and alcohol concerns about Mother. ***See id.***

Tate testified that Mother failed to alleviate the circumstances that led to Children's removal and had not made any progress in addressing her issues. ***See id.*** at 22.Throughout the life of this case, Mother was decreasingly compliant with her permanency goals. ***See*** Permanency Review Orders, 2/1/22, 8/4/22, 12/8/22, 1/25/22, 1/27/23; Court Summaries, 1/26/22, 8/3/22, 12/7/22, 1/25/23. Specifically, Mother did not make progress on her drug issues and repeatedly tested positive for Fentanyl, Methamphetamines, and Cocaine, and failed to schedule appointments for drug and alcohol treatment. ***See*** N.T. IVT Trial, 8/21/23, at 10-11, 13, 16. Although Mother had a job at one point, she did not keep the employment. ***See id.*** at 11, 20. Mother did not maintain safe and stable housing and was repeatedly evicted from apartments due to her lack of cleanliness and failure to pay rent. ***See id.*** at 11, 14, 18. Mother denied anyone lived at her home other than her, but she had a paramour come live with her and the police were called to the home several times for domestic violence. ***See id.*** at 17-18. Mother did not follow through with her mental health treatment, so she was unsuccessfully discharged from the mental health program. ***See id.*** at 17.

Based on the foregoing, we agree with the orphans' court that CYS provided clear and convincing evidence to satisfy the termination of Mother's parental rights pursuant to Section 2511(a)(1) of the Adoption Act.

Mother argues the court erred in its determination that it would be in the Children's best interest to terminate her parental rights because she and the Children have a strong bond. **See** Mother's Brief, at xxii. Mother provides no evidence of a bond, merely relying on Attorney George's statement "that the preferred outcome of [R.A.S. and G.E.S.] is that the IVT Petition be denied, as they did not wish to be adopted." **Id.** (citing N.T. IVT Trial, 8/21/23, at 63-64). Mother's argument fails.

["Section 2511(b) of] [t]he Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child, but our case law requires the evaluation of any such bond. **See In re E.M.**, 620 A.2d 481, 483 (Pa. 1993). "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." **In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010) (citation omitted).

Although Attorney George stated that Mother's parental rights should not be terminated because of R.A.S. and G.E.S.'s bond with her, there is no evidence of a bond between Mother and the Children. Tate expressly opined that there would not be any negative effect on the Children if Mother's rights were involuntarily terminated. **See** N.T. IVT Trial, 8/31/23, at 23. R.A.S. has lived with Maternal Grandmother since January 2022 and G.E.S. and L.K.A.

have lived with her since March 2022. Maternal Grandmother meets all their educational and behavioral needs. *Id.* at 16. The Children's truancy has stopped since being in Maternal Grandmother's home and, although the Children were on a lot of medication when first placed with Maternal Grandmother, they are "doing 100 percent better" in her care. *Id.* at 25; *see id.* at 12. Tate stated that CYS has offered several services to Mother to enable her to keep the Children with her, but she has not made use of them. *See id.* at 22. The Children are content and getting their medical and educational needs met. *See id.* They are being loved and are able to be kids, unlike in Mother's home where R.A.S. had to act as "the man of the house." *Id.*

Campbell corroborated this testimony, adding that the Children are thriving in kinship care, that G.E.S.'s medication has stopped completely, R.A.S.'s medication has been "significantly decreased," and L.K.A. is developing appropriately. *Id.* at 41. The Children told Campbell that they feel safe in Maternal Grandmother's home and Campbell said the Children are comfortable with both Maternal Grandparents. *See id.* at 43. Campbell explained that the last time the Children saw Mother was in the hallway at the July permanency review hearing when they said "hi" to her and waved. *See id.* at 43-44. The Children did not have any behavioral changes after seeing Mother that day and they have not asked to see her. *See id.* at 44.

Tate and Campbell both testified that termination of Mother's parental rights would be in the Children's best interest because they are young, need

consistency, and are safe and secure in Maternal Grandmother's home. ***See id.*** at 25-26. Based on all the foregoing, we conclude the record contains sufficient evidence to have permitted the orphans' court to infer that no bond exists between Mother and the Children and that it is in the Children's best interests to terminate Mother's parental rights. The trial court did not err or abuse its discretion when it terminated Mother's parental rights pursuant to subsection (b).

Accordingly, we affirm the decree of the Court of Common Pleas of Erie County that terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

FILED: 3/4/2024